UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROD EDDIE, PAULA EDDIE, and McCLINTOCK
REALTY, INC.,

                            Plaintiffs,

          -v-

SCOTTSDALE INSURANCE COMPANY,

                            Defendant.

Case No. 07-CV-3457 (KMK)

OPINION AND ORDER

Appearances:

Eli B. Basch, Esq.
Basch & Keegan, LLP
Kingston, New York
*Counsel for Plaintiffs*

Meryl R. Lieberman, Esq.
Dawn M. Warren, Esq.
Traub Lieberman Straus & Shrewsberry LLP
Hawthorne, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        In this diversity action, Plaintiffs Rod Eddie and Paula Eddie (together, the "Eddies"),

and their holding corporation, McClintock Realty, Inc. (collectively, "Plaintiffs"), seek a

declaratory judgment relating to their insurance coverage, and money damages for breach of

insurance contract, for losses they sustained as a result of a fire at Plaintiffs' property at 1057

State Road, Walden, New York ("1057 State Road"), against Defendant Scottsdale Insurance

Company ("Scottsdale" or "Defendant"), from which they purchased an insurance policy.

Defendant now moves for summary judgment on the grounds that an Occupancy Endorsement

clause in the policy that it sold to Plaintiffs precludes coverage.  For the reasons stated herein, Defendant's motion is granted.

## I.  Background

### A.  1057 State Road

Plaintiffs Rod Eddie and Paula Eddie purchased the property located at 1057 State Road in October 2005.  (Def.'s Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 4.) At the time of the purchase, the two-family house at 1057 State Road consisted of a basement, first-floor apartment, second-floor apartment, attic, and attached garage with three separate rooms.  (*Id.* ¶ 6.)  The Eddies purchased 1057 State Road with the intention of using it to store Mr. Eddie's business materials and equipment.  (*Id.* ¶ 12.)  Approximately two weeks after purchasing 1057 State Road, the Eddies transferred the property to their holding company, McClintock Properties, Inc.[1]  (*Id.* ¶ 7.)

At the time the Eddies purchased 1057 State Road, the house was occupied by tenants living in the first- and second-floor apartments.  (*Id.* ¶ 13.)  The first-floor apartment was occupied by an individual named Matthew Slater ("Slater"), and the second-floor apartment was occupied by the Calabrese family.  (*Id.* ¶ 14.)  These tenants also occupied portions of the attic and used the attached garage for storage purposes.  (*Id.* ¶ 15.)  On the same day that the Eddies purchased the property, Mr. Eddie informed Mr. Slater and the Calabrese family that they would have to vacate the premises.  (*Id.* ¶ 16.)  These tenants subsequently moved out of the house in February or March of 2006.  (*Id.* ¶ 17.)  From that time until the August 1, 2006 fire, the two-

---

[1] Although McClintock Realty, Inc. is named as Plaintiff in this action, at her October 18, 2007 deposition, Paula Eddie noted that McClintock Properties Inc. is the correct name of the holding company that owns 1057 State Road.  (Def.'s 56.1 ¶ 11 & Ex. F.)

story house was not used for residential purposes.  (*Id.* ¶ 21.)  No running appliances were left in the house, and no additions or renovations were made to the house.  (*Id.* ¶¶ 22, 33.)

Shortly after the tenants moved out, Mr. Eddie nailed shut the front door, the back screen door, and the two doors that led from the house to the attached garage.  (*Id.* ¶ 23.)  Subsequently, the only remaining unsecured access to the house was through the attached garage's roll-up door.  (*Id.* ¶ 24.)  Mr. Eddie and his employees utilized the attached garage to store and fix business equipment, and were at 1057 State Road approximately three to five times per week for this purpose.  (*Id.* ¶ 25.)  Mr. Eddie did not, however, authorize his employees or anyone else to stay at the house, and neither Mr. Eddie nor his employees performed any work inside the house.  (*Id.* ¶¶ 31-32.)  According to Mr. Eddie, approximately three weeks to one month before the fire, some person or persons broke into the house.  (Pls.' Rule 56.1 Counter-Statement of Facts ¶ 24.)  Mr. Eddie testified that he subsequently inspected the premises and found "a lot of beer bottles" and "several rubbers, stuff like that."  (*Id.*)

Mr. Eddie stored personal items inside the attic, basement, and attached garage, including antique lawn mower parts, glassware, and other miscellaneous items.  (Def.'s 56.1 ¶ 26.)  Mr. Eddie acquired these items when he purchased 1057 State Road, and from that time, Plaintiffs did not move, use, or repair these items.  (*Id.* ¶¶ 27-28.)

On August 1, 2006, a fire occurred inside 1057 State Road, after a lamp used to dry marijuana caused a mattress to catch fire in the second-floor back bedroom.  (*Id.* ¶¶ 18-19.)  Plaintiffs were able to salvage most of the antique personal items stored in the house, as well as all of Mr. Eddie's business equipment, and are not making any claims for these items under their insurance policy with Defendant.  (*Id.* ¶¶ 29-30.)  As a result of the fire, Plaintiffs eventually

3

demolished the house and leveled the property.  (*Id.* ¶ 20.)  Plaintiffs' claims for damages under

their policy with Defendant are based on the loss of the house at 1057 State Road, as well as the

costs they incurred in demolishing the property.  (Compl. 2.)

     B.  Scottsdale Policy

     Scottsdale issued to Plaintiffs the following policy:  Dwelling Policy, No. DFS 0561603,

for the policy period January 1, 2006 to January 1, 2007, for the location "1057 State Rd.,

Walden, NY 12586 – Loc #1:  Two Family, Frame – Tenant Occupied Dwelling; Loc #2: One

Family, Frame Dwelling Used For Storage" (the "Dwelling Policy").  (Def.'s 56.1 ¶ 35

(emphasis omitted).)  Location #1, where the fire took place, is subject to a liability limit of

$300,000, and a deductible of $2,500.  (*Id.*)  The policy on Location #2 was cancelled prior to

the August 1, 2006 fire.  (*Id.*)

     The Dwelling Policy contains a coverage provision which states:

<blockquote>

COVERAGES

This insurance applies to the Described Location, Coverages for which a Limit of Liability is shown and Perils Insured Against for which a Premium is stated.

COVERAGE A – Dwelling

We cover:

1.    The dwelling on the Described Location shown in the Declarations, used principally for dwelling purposes, including structures attached to the dwelling.

</blockquote>

(*Id.* ¶ 36 (emphasis omitted).)

     The Dwelling Policy also contains an Occupancy Endorsement, which states:

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE
READ IT CAREFULLY

OCCUPANCY ENDORSEMENT

It is a condition of this policy that the described building must be
occupied at the inception date of the policy.  It is a further condition
of this policy that any vacancy or unoccupancy of the described
building after the inception date of the policy must be reported to the
Company within thirty (30) days.

The Company shall not be liable for loss occurring while a described
building, whether intended for occupancy by owner or tenant, is
vacant, or unoccupied for more than sixty (60) consecutive days
immediately before the loss.

---

(*Id.* ¶ 37 (emphasis omitted).)

The Parties acknowledge that the Dwelling Policy does not define "vacant" or
"unoccupied."  (*Id.* ¶ 38.)

C.  Procedural History

Plaintiffs notified Scottsdale of their claim for fire losses under the Dwelling Policy on
August 3, 2006.  (*Id.* ¶ 39.)  Scottsdale subsequently undertook an investigation of the fire,
which included an examination of Rod Eddie under oath.  (*Id.* ¶ 40.)  After completing its
investigation, Scottsdale denied coverage in a letter to Plaintiffs dated January 8, 2007.  (*Id.*
¶ 41.)  Defendant informed Plaintiffs that it was denying coverage because 1057 State Road was
both vacant and unoccupied for more than sixty consecutive days immediately prior to the fire,
which, Defendant claims, precludes coverage pursuant to the Occupancy Endorsement contained
in Plaintiff's insurance policy.  (*Id.*)

Subsequent to Defendant's denial of coverage under the Dwelling Policy, Plaintiffs

initiated this insurance coverage action on April 16, 2007, in the Supreme Court of New York,

Orange County.  (Dkt. No. 1.)  On May 1, 2007, the action was removed to this Court on

diversity jurisdiction grounds.  (*Id.*)  On May 29, 2007, Defendant answered the Complaint,

denying all material allegations in the Complaint and asserting affirmative defenses, including

that coverage is precluded because (1) the property alleged in the Complaint did not constitute a

Tenant Occupied Dwelling for purposes of the Dwelling Policy, and (2) Defendant is not liable

pursuant to the terms of the Occupancy Endorsement.  (Def.'s 56.1 ¶ 43.)  Defendant

subsequently filed the instant motion.[2]  The Court heard oral argument on May 4, 2009.

## II.  Discussion

### A.  Standard of Review

#### 1.  Summary Judgment Standard

Summary judgment may be granted when it is shown that there is "no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-

moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of

material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.

2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

---

[2] On May 5, 2008, the Court denied Plaintiffs' Cross-Motion for Summary Judgment without prejudice for failure to comply with the Court's rules of individual practice.  (Dkt. No. 9.)

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

The Parties agree that New York law applies to this case.[3]  With respect to a contract claim, a court may grant summary judgment under New York law when the contractual language is "plain and unambiguous."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 148 (2d Cir. 1993); *see also Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion'" (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)) (second alteration in *Hunt*)).  Whether a contractual provision is ambiguous is a "threshold question of law to be determined by the court." *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (applying New York law) (internal quotation marks omitted); *see also Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d

---

[3] The Parties have relied on New York law in this diversity action, and their consent to the application of forum law is sufficient to end the choice of law inquiry.  *See 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999).

Cir. 2002) (noting that, under New York law, "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment").  However, unless the moving party can establish that contractual language is not "susceptible of at least two fairly reasonable meanings," a material issue exists concerning the parties' intent, and the parties have a right to present extrinsic evidence regarding the meaning of the contested term.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983) (applying New York law); *accord United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 300-01 (S.D.N.Y. 2003).  Under New York law, where "the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined," a question of fact is presented which cannot be resolved on a motion for summary judgment. *Hoyt v. Andreucci*, 433 F.3d 320, 331 (2d Cir. 2006); *accord Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).

2.  Insurance Contract Interpretation

Under New York law, an insurance contract is construed in the same manner as any other contract and should be read to give effect to the parties' intent as expressed in the language used in the contract.  *See Parks Real Estate Purchasing Group*, 472 F.3d at 42 ("New York insurance law provides that an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." (internal quotation marks omitted)); *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999) (same).  In New York, an insurance policy should be read by the court "in light of 'common speech' and the reasonable expectations of a businessperson."  *Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 17 (N.Y. 2003); *see also Ten Seventy One Home Corp. v. Liberty Mut. Fire Ins. Co.*, No. 07-CV-11211,

2008 WL 2464187, at *3 (S.D.N.Y. June 18, 2008) (same).  "If the provisions are clear and unambiguous, courts are to enforce them as written.  However, if the policy language is ambiguous[,] . . . the ambiguity must be interpreted in favor of the insured."  *Goldberger*, 165 F.3d at 182 (internal quotation marks omitted); *see also Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 129 (2d Cir. 2006) (recognizing general "tenet under New York law that where the precise meaning of insurance policies is ambiguous, their provisions are to be construed in favor of finding coverage"); *XL Specialty Ins. Co. v. Agoglia*, Nos. 08-CV-3821, 08-CV-4196, 08-CV-5252, 2009 WL 513747, at *12 (S.D.N.Y. Mar. 2, 2009) ("According to New York law, any ambiguities in an insurance policy must be strictly construed against the insurer.").  "The rule of strict construction against an insurance company's interpretation of a policy applies with particular force with respect to exclusions and words of limitation."  *XL Specialty*, 2009 WL 513747, at *12.

To negate coverage based on a policy exclusion, the insurer bears the burden of proving that a claim falls within the scope of an exclusion.  *See Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115-16 (2d Cir. 1995).  The insurer must establish that the exclusion is stated in "clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon."  *Parks Real Estate Purchasing Group*, 472 F.3d at 42 (internal quotation marks and citations omitted) (alteration in original); *see also Sea Ins. Co. v. Westchester Fire Ins. Co.*, 51 F.3d 22, 26 (2d Cir. 1995) (same).

B.  Analysis

As noted above, the Dwelling Policy contains an Occupancy Endorsement, which notes

that it "changes the policy" and which further states:

> It is a condition of this policy that the described building must be occupied at the inception date of the policy.   It is a further condition of this policy that any vacancy or unoccupancy of the described building after the inception date of the policy must be reported to the Company within thirty (30) days.
>
> The Company shall not be liable for loss occurring while a described building, whether intended for occupancy by owner or tenant, is vacant, or unoccupied for more than sixty (60) consecutive days immediately before the loss.

(Def.'s 56.1 ¶ 37 (emphasis omitted).)  The Parties both acknowledge that the Dwelling Policy does not define "vacant" or "unoccupied."  (*Id.* ¶ 38.)

The terms "vacant" and "unoccupied," as used in property insurance policies, have been found by New York courts to be both unambiguous and not synonymous in the context of dwellings.  *See Herrman v. Adriatic Fire Ins. Co.*, 85 N.Y. 162, 168 (N.Y. 1881) ("[W]hen the phrase 'vacant or unoccupied' is applied to a dwelling-house, plainly there is a purpose – an attempt to give a different statement of the condition thereof; by the first word, as an empty house, by the second word, as one in which there is not habitually the presence of human beings.").  Accordingly, the terms must be separately considered to determine whether the application of either would trigger exclusion under the Occupancy Endorsement.  *See Couto v. Exch. Ins. Co.*, 579 N.Y.S.2d 751, 752 (App. Div. 1992) ("Because the words 'vacant or unoccupied' are stated in the disjunctive, the words must be separately considered and either word if supported by a proper showing will trigger the exclusion.").

Generally, the term "vacant" means that a building or structure is entirely empty, which means that it is lacking both animate and inanimate objects.  *See Herrman*, 85 N.Y. at 168

10

(noting that in order for a house to be "vacant" it must "be empty" of "things inanimate" and "void" of "beings animate"); *cf. Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 471-72 (7th Cir. 1986) (noting that, under Illinois law, a building is vacant where it is completely empty but noting that the presence of a few "minimal" items did not preclude a finding of vacancy); *Frazier v. State Farm Fire & Cas. Co.*, 957 F. Supp. 816, 818 (W.D. Va. 1997) (finding building to be "vacant" where owner had removed all of its contents with the exception of a few items); *Speth v. State Farm Fire & Cas. Co.*, 35 P.3d 860, 861, 864 (Kan. 2001) (same).  Here, the Court finds that 1057 State Road arguably was not "vacant" at the time of the fire because Plaintiffs had numerous personal objects stored there, including valuable antiques, and the prior tenants also had left behind numerous household items and furnishings.

Courts have interpreted the term "unoccupied" according to the type of structure covered in the policy.  Thus, whether or not a structure is "unoccupied" will depend on the "occasion of its use[] and the subject-matter to which it is applied" under the terms of the insurance policy. *Herrman*, 85 N.Y. at 169; *see also Carroll v. Tenn. Farmers Mut. Ins. Co.*, 592 S.W.2d 894, 895 (Tenn. Ct. App. 1979) ("The term 'unoccupied' as used in fire insurance policies implies the absence of an occupant of the kind and during the time indicated by the terms and descriptions in the policy; and whether the use actually made of a building constitutes 'occupancy' depends upon the nature and character of the building, the purpose for which it is designed, and the use contemplated by the parties expressed in the insurance contract." (quoting *Cashen v. Camden Fire Ins. Ass'n*, 348 S.W.2d 883, 884 (Tenn. Ct. App. 1961))); *cf. N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 125 (2d Cir. 2001) (noting, under New York law, that an insurance policy should be construed in its entirety, with each clause interpreted in relation to

11

others contained in the policy).  Here, the Dwelling Policy describes "Location #1" as a "a Two

Family, Frame – Tenant Occupied Dwelling."  (Def.'s 56.1 ¶ 35 (emphasis omitted).)

Additionally, the Dwelling Policy's coverage provision states that it applies to the "dwelling on

the described location . . . used principally for dwelling purposes."  Accordingly, the Court finds

that the Dwelling Policy unambiguously describes the covered location as a "dwelling" to be

"used principally for dwelling purposes."

New York courts have long held that a "dwelling-house is chiefly designed for the abode

of mankind."  *Herrman*, 85 N.Y. at 167; *accord Huber v. Manchester Fire Assur. Co.*, 36 N.Y.S.

873, 877-78 (N.Y. Gen. Term 1895).  Other courts have found that the phrase "used principally

for dwelling purposes" signifies that the property is to be used for a residential purpose.  *See,*

*e.g.*, *Alger v. Am. Sec. Ins. Co.*, No. 07-CV-1438, 2008 WL 4426887, at *5 (W.D. Wash. Sept.

26, 2008) (finding "no ambiguity in the Policy's use of the language 'dwelling . . . used

principally for dwelling purposes'" to require the use of the structure as a residence or abode);

*Crawford v. Gov't Employees Ins. Co.*, 771 F. Supp. 1230, 1239 (S.D. Ga. 1991) (holding that

the phrase "'used principally for dwelling purposes'" means that "for coverage to be in effect the

premises must be used primarily as a place of abode").  Reference to dictionaries supports this

interpretation of the term "dwelling" and what is required for a structure to be "used principally

for dwelling purposes."  For example, *Webster's* defines "dwelling" as "an abode:  residence."

*Webster's II New Riverside Univ. Dictionary* (1984).  In addition, *Black's Law Dictionary*

defines "dwelling house" as "the house or other structure in which a person lives; a residence or

abode."  *Black's Law Dictionary* (8th ed. 2004).

With respect to structures used as "dwellings," New York courts have not broken a sweat

12

in concluding that actual residence is required for a dwelling to be "occupied" or that, at a minimum, there must exist the intent to reside in or inhabit the dwelling.  *See, e.g.*, *Halpin v. Phenix Ins. Co.*, 23 N.E. 482, 484 (N.Y. 1890) ("It has been decided that a dwelling-house, to be in a state of occupation, must be the customary abode of human beings; not absolutely and uninterruptedly continuous, but the house must be the place of usual return and habitual stoppage." (citing *Herrman*, 85 N.Y. at 169)); *McCabe v. Allstate Ins. Co.*, 688 N.Y.S.2d 764, 766 (App. Div. 1999) ("This court has previously determined that use of the word 'unoccupied' in an insurance policy carries its ordinarily accepted meaning and that [i]t is the regular presence of inhabitants that makes occupancy." (internal quotation marks and citations omitted) (alterations in original)); *Roof v. N.Y. Federated Underwriters*, 201 N.Y.S.2d 515, 520 (Sup. Ct. 1960) ("'[F]or a dwelling house to be in a state of occupation, there must be in it the presence of human beings as at their customary place of abode . . . .'" (quoting *Herrman*, 85 N.Y. at 169)); *Huber*, 36 N.Y.S. at 877 ("A dwelling house is unoccupied when no one lives therein.").[4]

In this case, it is beyond dispute that 1057 State Road was "unoccupied," as that term applies to a dwelling, at the time of the fire, and throughout the sixty days prior to the fire, because it was not the customary or usual place of habitation or abode of any resident or tenant,

---

[4] New York's interpretation of the term "occupied" as unambiguous with respect to "dwellings" is supported by the interpretation of that policy term in other jurisdictions.  *See, e.g.*, *McCarty v. Md. Cas. Co.*, 429 F. Supp. 112, 115 (W.D. Ark. 1976) (holding that the term "occupied" requires residence and is a term that is "unambiguous and is to be given the plain import of its language" (second internal quotation marks omitted)); *Schmidt v. Underwriters at Lloyds of London*, 82 P.3d 649, 652 (Or. Ct. App. 2004) ("[T]he house was not in actual use *by a person* using it *as his usual place of habitation*.  Therefore, the house was unoccupied at the time of fire and the 60 days before the fire within the meaning of the exclusion from coverage."); *Phillips v. Pioneer State Mut. Ins. Co.*, No. 197346, 1999 WL 33453287, at *1 (Mich. Ct. App. Mar. 23, 1999) ("A house is unoccupied when it ceases to be used for living purposes or as a customary place of human habitation." (internal quotation marks omitted)).

including Plaintiffs.  Once the last tenants left 1057 State Road in February or March of 2006, the property was "unoccupied" under the terms of the Occupancy Endorsement through the time of the August 1, 2006 fire.  Although Mr. Eddie and his employees visited the property to maintain the property and store items on it, Plaintiffs acknowledge that neither Mr. Eddie nor his employees performed any work inside the house.  And while Plaintiffs point out that some unknown person or persons may have left behind beer bottles and "rubbers," that is hardly evidence that 1057 State Road became a customary place of human habitation for any resident.

The fact that Plaintiffs stored personal items at 1057 State Road and that personal items had been left behind by the building's former tenants also does not create occupancy.  "The use of the building for storage would not create occupancy.  It is the regular presence of inhabitants that makes occupancy."  *Couto*, 579 N.Y.S.2d at 752 (internal citation omitted); *see also Carroll*, 592 S.W.2d at 896 ("Although there was certain personal property stored in the house and the plaintiffs went to the property to care for their dogs and garden and spent the night on several occasions in the house, we do not think this constitutes actually using the building for the purpose for which it was insured as a residence."); *Huber*, 36 N.Y.S. at 878 (finding that the fact that plaintiff's agent had a key and that plaintiff's furniture was in one room of the house did not make the house occupied as a dwelling house).

Further, Plaintiff's argument that the term "occupied" has a different meaning with respect to commercial structures is unavailing because the Dwelling Policy specifically covered the "dwelling on the Described Location," which was defined as "a Two Family, Frame – Tenant-Occupied Dwelling," and stated that it was covered so long as it was "used principally for dwelling purposes."  Thus, Plaintiffs' reliance on the Fourth Department's decision in *Gallo*

14

*v. Travelers Prop. Cas.*, 801 N.Y.S.2d 849 (App. Div. 2005) is misplaced.  In that case, the

policy defined "'unoccupied'" to mean "'contain[ing] personal property usual to the occupancy

of the building while customary activity and operations are suspended.'"  *Id.* at 851.  Under that

definition, the Fourth Department determined that summary judgment for the insurer was

inappropriate because there was "unrefuted proof" that two individuals were customarily using

the subject premises for various activities, including one individual using the premises to store

landscaping equipment for his business.  *See id.*  However, in this case the Dwelling Policy

contains no such definition of "unoccupied," and it plainly applies only to a dwelling and not to

the type of premises at issue in *Gallo*.[5]  For the reasons discussed above, the Court finds that the

terms "dwelling" and "used principally for dwelling purposes" are unambiguous and require the

property to be used for a residential purpose.  Thus, "the actual use of [the] house as a dwelling

place is the touchstone for occupancy" under the Dwelling Policy.  *Phillips*, 1999 WL 33453287,

at *1.

      While the Court recognizes that "any ambiguities in an insurance policy must be strictly

construed against the insurer," *XL Specialty*, 2009 WL 513747, at *12, here, the provisions are

---

     [5] At oral argument, Plaintiff argued that the dictionary definition of the term "occupied" is not limited to residence, but also contemplates other types of habitation.  *See Black's Law Dictionary* (defining "occupancy" as the "act, state, or condition of holding, possessing, or residing in or on something"); *Webster's II New Riverside Univ. Dictionary* (1984) (defining "occupy" as "[t]o reside in," as well as "[t]o seize possession of and maintain control over by force"; "[t]o fill up (space or time)"; "[t]o hold or fill (e.g., an office)"; "[t]o engage or busy (oneself)"; and "[t]o engross or keep busy").  However, as discussed herein, under New York law, courts have noted that whether or not a structure is "occupied" is contextually dependent on the type of structure covered by the insurance policy.  Thus, courts will interpret "unoccupied" according to "the occasion of its use" and "the subject-matter to which it is applied" within the insurance policy.  *Herrman*, 85 N.Y. at 169.  Here, the Dwelling Policy describes the covered subject matter to be a "dwelling" to be "used principally for dwelling purposes."  Thus, while the dictionaries may not limit "occupied" to a state of residence, the Dwelling Policy does.

"clear and unambiguous" and should be "enforce[d] . . . as written," *Goldberger*, 165 F.3d at

182. Accordingly, the Court finds, under the plain meaning of the Dwelling Policy, that because

1057 State Road was "unoccupied for more than sixty (60) consecutive days immediately before

the loss," Defendant properly denied coverage and is therefore entitled to summary judgment.

### III.  Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is granted.  The

Clerk of Court is respectfully directed to terminate the pending motion on the docket (Dkt. No.

13), enter judgment for Defendant, and close the case.

SO ORDERED.

Dated:          May **6**, 2009
               White Plains, New York


                                              KENNETH M. KARAS
                                              UNITED STATES DISTRICT JUDGE

16

Service List (by ECF):

Eli B. Basch, Esq.
Basch & Keegan, LLP
307 Clinton Avenue
P.O. Box 4235
Kingston, NY 12402
*Counsel for Plaintiff*s

Meryl R. Lieberman, Esq.
Dawn M. Warren, Esq.
Traub Lieberman Straus & Shrewsberry LLP
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, NY 10532
*Counsel for Defendant*